**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ROBERT WARD,** *on behalf of himself and all others similarly situated*<br><br>**v.**<br><br>**FLAGSHIP CREDIT ACCEPTANCE LLC** | **CIVIL ACTION**<br><br>**NO. 17-2069** |

**MEMORANDUM RE: MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT**

**Baylson, J.**                                                              **February 13, 2020**

**Table of Contents**

I.      Introduction ........................................................................................................ 2
II.     Background......................................................................................................... 3
    A. Procedural History ......................................................................................... 3
    B. Preliminary Approval ..................................................................................... 3
    C. Response from Class ....................................................................................... 5
    D. The Court's May 9, 2019 Memorandum ........................................................ 6
    E. Recommendation of Master............................................................................ 6
    F. Final Approval Hearing .................................................................................. 7
III.    Legal Standard .................................................................................................. 7
IV.     Considerations Under the Telephone Consumer Protection Act ("TCPA") .......... 10
    A. Statutory Damages under TCPA ................................................................... 12
    B. Unsettled Areas of TCPA Litigation ............................................................ 15
        1.  Unsettled Definition of "Automatic Telephone Dialing System".................... 15
        2.  Impending Supreme Court Review of Constitutionality of TCPA's
            "Government-Debt Exception"............................................................... 17
    C. TCPA Settlements ........................................................................................ 17
        1.  Features of Pro Rata Settlements .................................................... 18
        2.  Incorporating a "High-Low" Model.................................................. 20
V.      Discussion........................................................................................................ 22
    A. Initial Presumption of Fairness...................................................................... 23
    B. Girsh Factors................................................................................................ 24
        1.  Complexity, Expense and Likely Duration of Litigation................................ 24
        2.  Reaction of the Class to the Settlement....................................................... 25
        3.  Stage of Proceedings and Amount of Discovery Completed.......................... 26
        4 & 5. Risks of Establishing Liability and Damages ......................................... 28
        6.  Risks of Maintaining the Class Action Through Trial ................................... 30
        7.  Ability of Defendant to Withstand a Greater Judgment................................. 31
        8 & 9. Range of Reasonableness of Settlement Fund in Light of the Best
            Possible Recovery and All the Attendant Risks of Litigation.................... 34
            a.  Reasonableness in Light of Best Possible Recovery............................... 34

       i.  Comparison to <u>Snyder v. Ocwen</u> ................................................... 35

       ii.  Consideration of Other TCPA Settlements .................................. 37

      iii.  Plaintiff's Potential Damages...................................................... 38

      iv.  Per Claimant Recovery of $35.30 is De Minimis ......................... 39

   b.  Reasonableness in Light of Risks if Case Went to Trial...................... 41

  C.  <u>Prudential</u> Considerations............................................................. 42

  D.  <u>Baby Products</u> Considerations.............................................................. 45

VI.    Conclusion ................................................................................... 47

Appendix ................................................................................................ 49

## I.    Introduction

Settlement class representative Robert Ward ("Plaintiff") brought suit on behalf of himself and others similarly situated against Flagship Credit Acceptance LLC ("Flagship") alleging that Flagship violated the Telephone Consumer Protection Act by illegally calling class members' cell phones with an automatic telephone dialing system. After a mediation, Plaintiff and Flagship agreed to the terms of a class settlement, which the Court preliminarily approved. Plaintiff's Motion for Final Approval of Class Action Settlement and Motion for An Award of Attorneys' Fees and Expenses and an Incentive Award to the Named Plaintiff is now pending.

When, as here, parties reach a class action settlement agreement that conclusively terminates the claims of all class members (except those who have opted out, which is almost zero in this case), a judge may be inclined to approve the settlement. However, the recently amended Rule 23 provisions on judicial inquiry into class action settlements require careful scrutiny of the terms of the settlement to ensure they are fair, reasonable and adequate, and require a critical and independent review of the settlement provisions. It is now mandatory for the judge to examine the settlement agreement to protect the interests of the class members and ensure that they receive compensation that is fair in view of the statutory purposes.

For the reasons that follow, Plaintiff's Motions will be denied. The confluence of a number of negative factors motivates the decision to deny the settlement agreement that Class Counsel

presented. This Memorandum will describe the background of the case, discuss unique considerations implicated by the Telephone Consumer Protection Act, and analyze the proposed settlement under the Third Circuit's <u>Girsh</u> factors, the Third Circuit's <u>Prudential</u> considerations, and the Third Circuit's <u>Baby Products</u> inquiry.

## II.     Background

### A.     Procedural History

Plaintiff filed his Complaint in this Court on May 5, 2017, alleging that Flagship, a subprime lender that provides financing to car buyers who would not have access to credit through traditional debt markets, placed automated and prerecorded phone calls in violation of the Telephone Consumer Protection Act. (ECF 1.) The parties immediately entered into arm's-length settlement discussions before the Honorable Joel Rosen, a retired United States Magistrate Judge in the District of New Jersey, and reached agreement on terms in February 2018. (ECF 25-3, Memorandum in Support of Motion for Final Approval of Class Action Settlement at 1 ("Plaintiff's Final Approval Memorandum").) On July 12, 2018, Plaintiff moved for preliminary approval of the class action settlement, (ECF 20), which the Court granted on September 18, 2018, (ECF 21.)

### B.     Preliminary Approval

The discussion of the settlement in the memorandum accompanying Class Counsel's motion for preliminary approval focused on whether it fell within the range of other approved TCPA settlements such that disseminating notice to the class was justified. (ECF 20-2, Plaintiff's Preliminary Approval Memorandum at 17-20.) The Court granted the motion and preliminarily approved a class of "[a]ll persons whom Flagship called on their cellular telephone through the use of any version of a TCN, LiveVox or Aspect dialing system and/or with an artificial or

prerecorded voice at any time from May 5, 2013 to the date of preliminary approval [September 18, 2018]." (ECF 21, Preliminary Approval Order ¶ 4.)

Based on this class definition, the Settlement Administrator identified 327,924 class members.[1] (Plaintiff's Final Approval Memorandum at 4.) Notice was provided to the class members, who had the opportunity to make claims, object, or request to opt out of the settlement. Claimants who wished to file a form were directed to provide the following information: their claim number, name, address, city/state/zip, cell phone number at which they received the call, phone number (optional), and email (optional). (ECF 20-3, Ex. 3 Post Card Notice.) Class members also had access to a website, FlagshipTCPASettlement.com, that contained general information including a copy of the Motion for Attorney's Fees and an Incentive Award to the Named Plaintiff.

The settlement that was preliminarily approved provided that each class member who submitted a valid claim would receive an equal amount of the $4 million settlement fund,[2] entitling each claiming class member to "the same pro rata share." (Plaintiff's Preliminary Approval Memorandum at 16.) The pro rata distribution scheme was fully disclosed in both the post card notice and the long form notice. (ECF 29, Supplemental Submission Regarding Final Approval of Class Action Settlement and Attorney Fee Award at 2-3 ("First Supplemental Submission").)

_____

[1] Plaintiff's Preliminary Approval Memorandum "estimate[d] that there are approximately 178,944 members of the Settlement Class as of May 31, 2018." (Plaintiff's Preliminary Approval Memorandum at 3.) Indeed, the estimates that Plaintiff provided to compare the per claimant recovery here to that of other TCPA cases assumed a class size of 200,000. (Id. at 18 n.5.) Plaintiff emphasized that the recoveries discussed were "estimates only" and that "the exact figures … will depend on the total number of [v]alid [c]laims received, the costs of [n]otice and [s]ettlement [a]dministration, and the Court's disposition of the [s]ettlement [f]und." (Id. at 18.)

[2] The parties refer to this as "pro rata" distribution but, as noted in a prior memorandum, the Court "understands the term 'pro rata' to refer to a proportionate share of a settlement fund relative to others depending on variable factors." (ECF 31, May 19, 2019 Memorandum at 2.) Therefore, the Court is of the opinion that "the return is [better] characterized as 'per capita' because each and every class member who filed a claim will be getting the same amount." (Id. at 2-3.) The Court acknowledges Class Counsel's representation that the case law treats "pro rata" as synonymous with "per capita." (ECF 34, Second Supplemental Submission at 12.)

The preliminary approval settlement papers also proposed an attorney's fee award of one-third of the settlement fund (or $1,333,333.33) and a $10,000 incentive award for the class representative. (Plaintiff's Preliminary Approval Memorandum at 5.) Class Counsel requested that Jump$tart Coalition for Personal Financial Literacy be approved as the cy pres recipient, and that (a) the fraction of a penny due to a claiming class member and (b) any uncashed checks be distributed to cy pres. (Plaintiff's Final Approval Memorandum at 16.)

The final breakdown of these proposed payments is as follows:[3]

| Expense | Amount |
|---|---|
| Total Value of Settlement Fund | $4,000,000.00 |
| Attorney's Fees | $1,333,333.33 |
| Named Representative Incentive Award | $10,000.00 |
| Administrative Costs | $282,393.00 |
| **Available Funds for Settlement Class** | **2,374,273.67** |

## C.    Response from Class

Following dissemination of the class notice, only four percent of the notices sent were returned as undeliverable, and the Settlement Administrator received a total of 118,924 claim forms. (Plaintiff's Final Approval Memorandum at 5.) Of the claim forms received, 67,255 were timely submitted and nonduplicative, representing a participation rate of 20.5%.[4] (First Supplemental Submission at 4.) Only four potential class members opted out of the settlement. (Id. at 1.) No potential class members filed objections to the proposed settlement. (Id.)

---

[3] (First Supplemental Submission at 4 n.4.)

[4] The First Supplemental Submission reported the participation rate at 20.5%, a slight adjustment upward from the 17.4% participation rate reported in Plaintiff's Final Approval Memorandum. At the January 13, 2020 Final Approval Hearing, Class Counsel provided a chart that listed the participation rate at 20.4%; this chart was not publicly filed. Because the 20.5% participation rate is the only rate that is reflected on the public docket, the participation rate will be described as 20.5%.

**D.     The Court's May 9, 2019 Memorandum**

Plaintiff moved for final approval of the class settlement, (ECF 25), and for attorney's fees and the class representative incentive award, (ECF 26), on March 19, 2019.  Once the one-third attorney fee award, $10,000 class representative incentive award, and costs of administration are deducted from the $4 million settlement fund, each of the 67,255 class members would receive $35.30.  (Id. at 4 n.4.)

A hearing was held on April 2, 2019 to discuss Plaintiff's motion for final approval, following which Plaintiff submitted supplemental materials.  (ECF 29.)     On May 9, 2019, the Court determined that it needed more information to demonstrate that the $4 million settlement "is 'fair and reasonable' to the members of the class."  (May 9, 2019 Memorandum at 1.)  The Court's Memorandum noted that "in many, if not most, decisions approving large class settlements, the Court has had exposure to the controversy, and the underlying facts, and legal issues," but that this factual background was missing since Flagship never filed an answer or motion.  (Id.)  The Memorandum advised that "additional detailed information as to the strength or weakness of the Plaintiffs' claims, and the Defendant's anticipated defenses, the Defendant's resources, and a projection of damages that Plaintiffs would have been able to prove if the case had gone to trial" was necessary for the Court to assess the settlement under the Third Circuit's Girsh factors.  (Id. at 3.)  Pursuant to the Court's Memorandum, Plaintiff submitted additional supplemental material. (ECF 34.)

**E.     Recommendation of Master**

Despite Plaintiff's second supplemental submission, the Court "continue[d] to have some concerns about the reasonableness of the proposed settlement," and therefore appointed a special master "for limited purposes of reviewing the proposed settlement."  (ECF 35 (Order Re: Proposed

Master); ECF 38 (Order Appointing as Master the Honorable Jane Greenspan, former Pennsylvania Supreme Court Justice).)  The Master "met with Class Counsel for the plaintiff class and Flagship … separately and then jointly," and required each side to submit brief statements supporting various assertions that were made.  (ECF 44, Master's Settlement Report at 2.)  The Master ultimately recommended "that the class action settlement be approved as fair and reasonable and as meeting the Third Circuit requirements set forth in Girsh."  (Id.)  Neither party filed objections to the Master's report.  The Court greatly appreciates Justice Greenspan's Report.

### F.  Final Approval Hearing

The Court ordered Flagship to submit all financial materials that were provided to the Master for in camera review.  (ECF 40; ECF 41.)  Flagship submitted financial statements for both itself and its parent, FC HoldCo LLC.  Following the Court's review of the financials, a hearing was held on Plaintiff's motion for final approval.

At the hearing on January 13, 2020, Class Counsel reiterated their arguments in the briefing that the $4 million pro rata settlement is fair and reasonable and that the settlement should be approved.  Class Counsel also responded to a chart that had been prepared by the Court and shared with counsel in advance of the hearing containing data for other TCPA settlements.[5]

### III.  Legal Standard

Federal Rule of Civil Procedure ("Rule") 23(e) provides that "claims … of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval."  Amendments to Rule 23 that took effect on December 1, 2018 clarified the standards that guide a district court's preliminary and final review of a proposed settlement.

---

[5] The Appendix to this Memorandum contains the chart prepared by the Court as modified by Class Counsel.

As amended, Rule 23(e)(1)(B)(i)–(ii) now provides specific requirements that a district court must ensure are satisfied prior to granting <u>preliminary</u> approval.[6]  <u>See</u> Fed. R. Civ. P. 23 Advisory Committee Note on 2018 Amendment to Subdivision (c)(2) (noting that Rule 23(e)(1) addresses the "decision [that] has been called 'preliminary approval' of the proposed class certification in Rule 23(b)(3) actions").  Specifically, the court must be satisfied that it "will likely be able to (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal."  Fed. R. Civ. P. 23(e)(1)(B).  If these requirements are satisfied, then notice of the proposed settlement will be disseminated to the class.  Preliminary approval decisions are not appealable.  Fed. R. Civ. P. 23(f).

Rule 23(e)(2) provides requirements that a district court must ensure are satisfied prior to granting <u>final</u> approval.  Obtaining final approval of a class action settlement under Rule 23(e) requires that, after a hearing, the district court find the settlement to be "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Specifically, Rule 23(e)(2) requires that the court consider whether

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

---

[6] This Court granted preliminary approval on September 18, 2018, shortly before the Rule 23 amendments became effective.  (ECF 21.)  As such, the motion for preliminary approval was evaluated under the previous version of Rule 23, which did not specify a standard for evaluating preliminary approval motions.  <u>See</u> <u>Krimes v. JPMorgan Chase Bank, N.A.</u>, No. 15-5087, 2016 WL 6276440, at *3 (E.D. Pa. Oct. 26, 2016) (Robreno, J.) ("[T]he exact process a district court should follow when presented with a 'settlement class' is not prescribed by Rule 23(e).").

Paragraphs (A) and (B) constitute the "procedural" aspects of the fairness analysis, and "look[] to the conduct of the litigation and of the negotiations leading up to the proposed settlement." Fed. R. Civ. P. 23(e)(2) Advisory Committee Note ("Rule 23 Advisory Committee Note"). Paragraph A requires that the court conduct "a backward-looking assessment of the actual quality of representation afforded by class counsel."[7] Paragraph B necessitates consideration of how the settlement was conducted; relevant to this question is whether a "neutral or court-affiliated mediator or facilitator" was involved in the negotiations. Rule 23 Advisory Committee Note.

Paragraphs (C) and (D) guide the "substantive" review of the proposed settlement, and require the court to analyze the "relief that the settlement is expected to provide." Rule 23 Advisory Committee Note. Paragraph (C)(i) invites analysis of the settlement as compared to "the likely range of possible classwide recoveries and the likelihood of success in obtaining such results;" Paragraph (C)(ii) queries whether the claims process for the proposed settlement is "unduly demanding;" Paragraph (C)(iii) examines the proposed attorney's fee award as compared to the relief provided to the class; and Paragraph (C)(iv) requires the court to account for any side agreements that are made in connection with the proposed settlement. Id. Paragraph D considers whether "the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Id.

The factors set forth in Rule 23(e) do not replace the factors and considerations that the Third Circuit has developed; rather, the Rule 23(e) factors augment the analysis. See id. ("The goal of [the Rule 23(e)(2)] amendment is not to displace any factor, but rather to focus the court

---

[7] Rhonda Wasserman, The New, Improved Class Action Rule: The December 2018 Amendments to Rule 23, Pa. B. Ass'n Q. 182, 186 (Oct. 2019).

and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.").

The district court's role under Rule 23(e) is that of "a fiduciary guarding the rights of the absent class members." In re AT&T Corp., 455 F.3d 160, 175 (3d Cir. 2006) (internal quotation marks and citations omitted); see also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997) (noting that the interests of absentees "demand undiluted, even heightened, attention in the settlement context"); In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 349 (3d Cir. 2010) (highlighting that the trial judge's role under Rule 23(e) is an "important responsibility"); Ehrheart v. Verizon Wireless, 609 F.3d 590, 593 (3d Cir. 2010) (explaining that Rule 23(e)'s fairness inquiry is intended "to protect the unnamed members of the class from unjust or unfair settlements").  "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975). When evaluating a settlement, "courts should not substitute the parties' assurances or conclusory statements for its independent analysis of the settlement terms, [and should not] withhold approval simply because the settlement may not be the best settlement." Chester Upland Sch. Dist. v. Pa., 284 F.R.D. 305, 323-24 (E.D. Pa. 2012) (Baylson, J.) (internal quotation marks and citations omitted).

## IV.    Considerations Under the Telephone Consumer Protection Act ("TCPA")

Unsolicited telephone marketing calls ("robocalls") are a significant, pervasive problem facing consumers and have aroused ire and frustration in millions of Americans.  In December 2019, YouMail, a third party that tracks and publishes data on robocalls, identified 4.6 billion robocalls placed for the month, averaging to 147.3 million robocalls per day, or 6.1 million per

hour, with each person receiving 13.9 robocalls.[8]  Robocalls are not only irksome; they are also dangerous.  A robocall scam in which individuals impersonated Social Security Administration agents to trick call recipients into sharing personal information or transferring money cost consumers $19 million in 2019.[9]  Robocalls have caught the attention of regulators and legislators alike—both the Federal Communications Commission ("FCC") and the Federal Trade Commission ("FTC") have consistently prioritized robocall enforcement, and Congress has passed numerous statutes designed to combat and deter illegal robocalls.[10]

The TCPA, which restricts the use of calls made with a prerecorded voice or automatic telephone dialing system, is one potent mechanism to deter robocalling.  Senator Ernest Hollings, the sponsor of the bill, explained that the TCPA was necessary because "[c]omputerized telephone calls are invading our homes and destroying our privacy, … [and] are the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).  Congress passed the TCPA based on its findings that "[u]nrestricted telemarketing … can be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety."  47 U.S.C. 227 Notes, Congressional Statement of Findings (5).

This Section discusses (A) the availability of statutory damages under the TCPA, and how the TCPA's damages regime differs from that of other consumer protection statutes; (B) two areas in which TCPA litigation is unsettled: (1) the unresolved definition of "automatic telephone dialing system" and (2) the Supreme Court's recent grant of certiorari to consider the constitutionality of

---

[8] YouMail, RobocalII Index, https://robocallindex.com/ (last visited Jan. 30, 2020).

[9] Fed. Trade Commission, Consumer Protection Data Spotlight: Growing Wave of Social Security Imposters Overtakes IRS Scam (Apr. 12, 2019), https://www.ftc.gov/news-events/blogs/data-spotlight/2019/04/growing-wave-social-security-imposters-overtakes-irs-scam.

[10] Most recently, the Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act ("TRACED Act") was signed into legislation in December 2019.  The bill had bipartisan support in both the House and the Senate.

an exception to the TCPA; and (C) how the common pro rata structure of TCPA settlements may provide negative incentives, but how a "high-low" model could solve the concern.

### A.      Statutory Damages Under TCPA

The TCPA provides a private right of action, 47 U.S.C. § 227(b)(3), and specifies damages of $500 or actual monetary loss (whichever is greater) per violation, 47 U.S.C. § 227(b)(3)(B), or up to $1,500 for willing or knowing violations, 47 U.S.C. § 227(b)(3)(C).[11]  The TCPA's award of statutory damages mirrors other "consumer-protection statutes [that] authorize the award of damages … for violations that cause so little measurable injury that the cost of proving up damages would exceed the damages themselves, making the right to sue nugatory." Crabill v. Trans Union, LLC, 259 F.3d 662, 665 (7th Cir. 2001).  However, the damages provision of the TCPA is unique compared to that of other federal consumer protection statutes in two ways.

First, the TCPA does not impose a cap on statutory damages in class actions, unlike the statutory damages provisions of other consumer protection statutes.  The damages provision of the Truth in Lending Act ("TILA") caps class damages at "the lesser of $1,000,000 or 1 per centum of the net worth of the creditor" in class actions, 15 U.S.C. § 1640(a)(2)(B); the damages provision of the Fair Debt Collection Practices Act ("FDCPA") limits statutory damages to "the lesser of $500,000 or 1 per centum of the net worth of the debt collector" in class actions, 15 U.S.C. § 1692k(a)(2)(B); and the Electronic Funds Transfer Act ("EFTA") limits damages to "such amount as the court may allow, except that … (ii) the total recovery … shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the defendant" in class actions, 15 U.S.C. § 1693m(a)(2)(B).

---

[11] The amount of statutory damages available under the TCPA was "set to be fair to both the consumer and the telemarketer."  137 Cong. Rec. 30821 (1991).

No such cap appears in the TCPA, which has resulted, in some cases, in "shockingly large" damages awards. Golan v. FreeEats.com, Inc., 930 F.3d 950, 962 (8th Cir. 2019); see, e.g., id. at 963 (concluding that a TCPA verdict of $1.6 billion—statutory damages of $500 for each of 3,242,493 calls—violated the due process clause because the defendant plausibly believed it was not violating the TCPA and the harm was not severe). Fear of a crippling obligation is intensified in a context such as the TCPA where actions are often brought on behalf of a class of consumers. See, e.g., Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 164 (3d Cir. 2001) (highlighting the possibility that class certification may place "inordinate or hydraulic pressure on defendants to settle, avoiding the risk, however small, of potentially ruinous liability" as one factor to be considered in deciding whether to allow interlocutory appeal). Nonetheless, through the TCPA Congress has spoken plainly about the consequences of engaging in robocalling.

There is tension between, on the one hand, concern that a large TCPA verdict will effectively force a defendant into bankruptcy, and, on the other, the fact that Congress has unambiguously expressed its intent that TCPA violators be held liable in the amount of $500 per violation. See Centerline Equip. Corp. v. Banner Pers. Serv., Inc., 545 F. Supp. 2d 768, 778 (N.D. Ill. 2008) ("The Due Process clause does not require Congress to make illegal behavior affordable, particularly for multiple violations."). Indeed, Congress does not have to tie the statutory remedy to the individual recovery; Congress "may choose an amount that reflects the injury to the public as well as to the individual." Id. at 777. If a defendant chooses to go to trial and is found liable, Congress's determination as to the appropriate level of statutory damages should be followed, subject to the constitutional limitation that "the penalty prescribed [should not be] so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." St. Louis, I.M. & S. Ry. Co. v. Williams, 251 U.S. 63, 66-67 (1919).

Second, unlike other consumer protection statutes, which give the judge discretion in determining how much each claimant is entitled to (subject to a maximum amount), liability under the TCPA <u>automatically</u> entitles the claimant to the $500 statutory damage award—there is no "up to" or "not exceeding" language that gives the judge flexibility in fashioning an appropriate award. <u>Compare</u> TCPA, 47 U.S.C. § 227(b)(3)(B) (explaining that an individual who establishes a violation is "to receive $500 in damages"), <u>with</u> TILA, 15 U.S.C. § 1640(a)(2)(A) (establishing ranges of minimum and maximum awards based on the type of violation), FDCPA, 15 U.S.C. § 1692k(a)(1)(2)(A) (providing that, in an individual action, actual damages may be supplemented by "such additional damages as the court may allow, <u>but not exceeding</u> $1,000") (emphasis added), <u>and</u> EFTA, 15 U.S.C. § 1693m(a)(2)(A) (stating that an individual may recover actual damages plus "an amount not less than $100 <u>nor greater than</u> $1,000) (emphasis added).

Despite the fact that the TCPA provides for damages of $500 per call (trebled for a willful violation), TCPA cases that settle almost always result in per claimant awards that are <u>far</u> less than the statutory damages amount.  Even TCPA settlements that are on the high side of per claimant recovery result in awards that are considerably less than what the TCPA provides for.  <u>See, e.g.</u>, <u>Brown v. Rita's Water Ice Franchise Co. LLC</u>, No. 15-3509, 2017 WL 4102586, at *3 (E.D. Pa. Sept. 14, 2017) (Savage, J.) (per claimant award of $144); <u>Ott v. Mortg. Inv'rs Corp. of Ohio, Inc.</u>, No. 3:14-00645, 2016 WL 54678, at *1 (D. Or. Jan. 5, 2016) (per claimant award of $140.86); <u>Grannan v. Alliant Law Grp., P.C.</u>, No. C10-02803 HRL, 2012 WL 216522, at *7 (N.D. Cal. Jan. 24, 2012) (per claimant award of $300–$325).  While the TCPA may be laudable in deterring bad behavior and discouraging the improper accumulation of assets by companies who engage in robocalling, the significant administrative burden it imposes on federal courts cannot be ignored. This Court is of the opinion that because "[o]ur scarce federal judicial resources cannot be

allocated on the assumption that they must provide a forum for the vindication of every individual wrong however slight," de minimis class action recoveries, such as TCPA recoveries, may not be worth the costs they impose on our judicial system.  Hackett v. Gen. Host. Corp., 455 F.2d 618, 626 (3d Cir. 1972).  Indeed, because of "the reality of already over-taxed judicial resources," a court may feel compelled to "dispose of … onerous [class] litigation through the settlement class device."  In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 790 (3d Cir. 1995).  However, the ultimate "losers in this type of scenario are not only inadequately represented class members but also the federal courts as an institution."  Id.

**B.      Unsettled Areas of TCPA Litigation**

There is uncertainty in various aspects of establishing TCPA liability because cellphone technology has evolved in the twenty-eight years since Congress enacted the statute.  Two areas of uncertainty that have received considerable attention are (1) the unsettled definition of the statutory term "automatic telephone dialing system;" and (2) questions about the constitutionality of the TCPA generally.

**1.      Unsettled Definition of "Automatic Telephone Dialing System"**

One unresolved issue is the proper definition of the statutory phrase "automatic telephone dialing system" ("ATDS").  This Court opined on that question in Dominguez v. Yahoo!, Inc., 8 F. Supp. 3d 637 (E.D. Pa. 2014), holding that because the plaintiff had not offered evidence to show that the defendant's system had capacity to randomly generate telephone numbers, the plaintiff had not demonstrated that the defendant's system was an ATDS as required by the TCPA. Id. at 644.  On appeal, the Third Circuit reversed and remanded to allow the Court to consider a 2015 FCC Order that expansively interpreted the term "ATDS."  Dominguez v. Yahoo, Inc., 629 F. App'x 369, 373 (3d Cir. 2015).

After this Court reconsidered <u>Dominguez</u> in light of the 2015 FCC Order, the United States Court of Appeals for the District of Columbia Circuit invalidated the FCC's 2015 interpretation of what type of device qualifies as an ATDS, finding that the FCC's definition of ATDS was unreasonably expansive.  <u>ACA Int'l v. Fed. Commc'ns Comm'n.</u>, 885 F.3d 687, 700-03 (D.C. Cir. 2018).  In the wake of the D.C. Circuit's decision in <u>ACA International</u>, a circuit split developed regarding the proper definition of "ATDS" under the TCPA.  <u>Compare</u> <u>Dominguez v. Yahoo, Inc.</u>, 894 F.3d 116, 121 (3d Cir. 2018) (concluding that because "[Plaintiff] cannot point to any evidence that creates a genuine dispute of fact as to whether the Email SMS Service had the present capacity to function as an autodialer by generating random or sequential telephone numbers and dialing those numbers," the TCPA was not the proper means of redress), <u>and</u> <u>King v. Time Warner Cable Inc.</u>, 894 F.3d 473, 479 n.5 (2d Cir. 2018) (reaching "essentially the same conclusion [as the Third Circuit] in <u>Dominguez</u>" regarding whether present capacity to function as an autodialer was required under the TCPA), <u>with</u> <u>Marks v. Crunch San Diego, LLC</u>, 904 F.3d 1041, 1052 n.8 (9th Cir. 2018) (declining "to follow the Third Circuit's unreasoned assumption that a device must be able to generate random or sequential numbers in order to qualify as an ATDS").

Following the D.C. Circuit's decision in <u>ACA International</u> and the Ninth Circuit's decision in <u>Marks</u>, the FCC sought two sets of comments.  First, on May 14, 2018, the FCC solicited comment on "what constitutes an 'automatic telephone dialing system'" and "how to interpret 'capacity' in light of the [D.C. Circuit's] guidance."[12]  Second, on October 3, 2018, the FCC solicited supplemental comment "on what constitutes an 'automatic telephone dialing

---

[12] Public Notice, Consumer and Governmental Affairs Bureau Seeks Comment on Interpretation of the Telephone Consumer Protection Act in Light of the D.C. Circuit's <u>ACA International</u> Decision at 1, 2 (May 14, 2018), https://docs.fcc.gov/public/attachments/DA-18-493A1.pdf (the "May FCC Notice").

system'" in light of the Ninth Circuit's decision in <u>Marks</u>.[13]   The FCC has not issued further guidance on the definition of ATDS in light of the comments it received, and the circuit split remains unresolved.[14]

### 2.   Impending Supreme Court Review of Constitutionality of TCPA's "Government-Debt" Exception

Another unresolved issue is the constitutionality of the TCPA under the First Amendment. On January 10, 2020, the Supreme Court granted the petition for a writ of certiorari in <u>Barr v. American Association of Political Consultants, Inc., et al</u>.  The question presented in that case is "[w]hether the government-debt exception to the TCPA's automated-call restriction [excluding from the TCPA's prohibition calls that are 'made solely to collect a debt owed to or guaranteed by the United States'] violates the First Amendment, and whether the proper remedy for any constitutional violation is to sever the exception from the remainder of the statute."  Pet. for Writ of Cert., Barr v. Political Consultants, No. 19-631 (Nov. 15, 2019).  Depending on the approach the Supreme Court takes, the general constitutionality of the TCPA may be in question.

### C.   TCPA Settlements

TCPA settlements are often distributed pro rata, which means that each class member receives an equal amount from the settlement fund.  Subsection IV.B.1 discusses the effect that this structure has on incentives and subsection IV.B.2 proposes a "high-low" model for settlement that protects against the possibility for negative incentives.

---

[13] Public Notice, Consumer and Governmental Affairs Bureau Seeks Further Common on Interpretation of the Telephone Consumer Protection Act in Light of the Ninth Circuit's <u>Marks v. Crunch San Diego, LLC</u> Decision at 1 (Oct. 3, 2018), https://docs.fcc.gov/public/attachments/DA-18-1014A1.pdf (the "October FCC Notice").

[14] An early version of the House's version of the TRACED Act contained language addressing how the FCC should define "ATDS."  However, the final bipartisan version of the Act omitted the ATDS language, leaving intact the fractured legal landscape.  <u>See generally</u> Laura H. Phillips, Legislation Looking Likely on a Number of TCPA "Hot-Button" Issues, Nat'l L. Rev. (Dec. 11, 2019), https://www.natlawreview.com/article/legislation-looking-likely-number-tcpa-hot-button-issues.

### 1. Features of Pro Rata Settlements

In the vast majority of TCPA class settlements, the settlement fund is distributed on a pro rata basis, meaning that each class member who submits a legitimate claim is entitled to an equal share of the settlement fund.  The rationale for this distribution scheme is that it is costly and infeasible to administer the settlement based on the number of calls each claimant received. Pro rata settlements are distinct from settlements that are distributed based on claims made (i.e., recovery is tied to injury suffered), or a preset formula.  For class members in a pro rata settlement, relief is not commensurate with injury or harm incurred—in the TCPA context, recovery does not correspond to the number of robocalls received.[15]  Recovery is simply a function of the number of valid claims submitted.

In a TCPA settlement that is distributed pro rata, an ironic outcome results from a high participation rate: each individual class member's recovery is effectively reduced by the participation of the other class members.  In other words, a high participation rate reduces the per claimant award because the amount of available funds for distribution will be rationed to a greater number of class members; conversely, a low participation rate increases the per claimant award because the amount of available funds will be greater.  Compare Hashw v. Dep't Stores Nat'l Bank, 182 F. Supp. 3d 935, 945 (D. Minn. 2016) (noting that participation rate of 20% was "relatively high" and resulted in per claimant award of approximately $33.20), with Bayat v. Bank of the W., No. C-13-2376 EMC, 2015 WL 1744342, at *5 (N.D. Cal. Apr. 15, 2015) (stating that because the claims rate was only 1.9%, each claimant would receive $151), and

---

[15] The opt out right is one mechanism that counters this effect of a pro rata distribution scheme, because the right to opt out gives class members who received a high number of calls the ability to exclude themselves from the settlement in favor of individual litigation.  See Snyder v. Ocwen Loan Servicing, LLC, No. 14 C 8461, 2018 WL 4659274, at *4 (N.D. Ill. Sept. 28, 2018) ("Ocwen I") ("[T]he ability to opt out … has provided a safety valve that permitted class members on the higher end of the call spectrum to, in effect, vote with their feet and pursue the possibility of a greater award.").

Grannan, 2012 WL 216522, at *7 (explaining per claimant award would be approximately $300-$325 because only 1.44% of the notified class members submitted valid claim forms).

Brown v. Rita's Water Ice illustrates the inverse relationship between the participation rate and the per claimant award. The plaintiffs in Brown received unsolicited, automated text messages and sued the defendant for violating the TCPA. 2017 WL 4102586 at *1. The motion for final approval before the court was precipitated by a "significant reduction in the number of valid claim forms." Id. at *2. The court's original approval was based on the parties' representation that 28,523 claim forms were received, which would have resulted in a per claimant award of $66.54. Id. However, once the settlement administrator reviewed the claims, it determined that only 10,164 of the 28,523 claim forms received were valid and nonduplicative; this meant that "each claimant [would] recover more than double the amount previously ordered." Id. at *3 (emphasis added). Judge Savage ultimately gave his final approval because "the eligible class members will receive a greater benefit" due to the reduced number of claimants. Id. at *4. The participation rate of the approved final settlement in Brown was 7.3% and, when applied to the settlement fund of $3 million, resulted in a per claimant award of $144.00. Id.

In a sense, then, individual class members are punished when there is a high rate of participation because their individual awards are reduced relative to what the per claimant award would have been had the participation rate been lower. This perverse result is incongruous with a statute that is explicitly designed to "make it easier for consumers to recover damages" from those who make computerized calls by providing a private right of action and statutory damages of $500 per violative call. 137 Cong. Rec. 30821 (1991). Nonetheless, pro rata settlements are regularly approved in TCPA cases.

Meanwhile, TCPA defendants benefit from pro rata settlements because, in exchange for the release of the claims of all of the class members, their liability is capped at the amount of the settlement fund.  See General Motors, 55 F.3d at 790 (noting "the incentive a defendant has to bind as many potential claimants as possible with an approved class settlement").  Settling defendants thus face a strategic litigation choice and potential contradiction.  If they deny liability and oppose a class at the beginning of a case but later reach a settlement, they may be in the awkward position of enthusiastically endorsing the broadest possible class definition (so as to preclude later litigation)—the very position they previously contested.  Counsel for TCPA plaintiffs also benefit because their fee award is a percentage of the settlement fund.

### 2.      Incorporating a "High-Low" Model

Structuring putative TCPA settlements with a "high" and a "low" may provide better protection to consumers who are injured by illegal robocalls.[16]  In such a structure, the proposed settlement would have a "low" value that acts as a floor and guarantees an adequate per claimant recovery if the participation rate is low.  The proposed settlement would also have a "high" value that acts as a cap on the defendant's liability and is used where the participation rate is high.  A high-low settlement scheme maintains the pro rata characteristic of customary TCPA settlements and also ensures that the per claimant recovery is not a function of class members' participation.  This model protects the individual recovery of the class members, but also limits the financial exposure of the TCPA defendant.  At least two courts have approved settlement agreements employing similar structures.

First, in Charvat v. Valente, No. 12:5746, 2019 WL 5576932 (N.D. Ill. Oct. 28, 2019),

---

[16] High-low deals are sometimes used to set a range for a jury award.  See Elizabeth Chamblee Burch, Mass Tort Deals: Backroom Bargaining in Multidistrict Litigation (2019) at 74 ("[I]f a plaintiff wins a big verdict, the arrangement would lower it to a prenegotiated amount, thereby limiting [the defendant's] financial exposure. Conversely, if [the defendant] wins, under the deal the plaintiff would still receive a nominal 'low-end' award.").

the approved settlement agreement established a settlement fund of between $7,000,000 and $12,500,000, with the actual amount of the fund determined based on the number of valid claims filed.  Id. at *2 n.1.  Because of the high number of valid claims, the settlement fund maxed out at the $12,500,000 cap.  Id. at *2.  The settlement permitted each claimant "to recover for up to three calls per telephone number, with a maximum value for each call set at $300."  Id.  Even though the terms of the settlement allowed each claimant to recover a maximum of $900, the actual recovery was reduced because the number of claims submitted exceeded the value of the settlement fund, resulting in each claimant receiving, on average, $22.17.  Id.  Two features of the Charvat settlement warrant emphasis.  First, the high-low structure permitted the defendant to negotiate for an absolute cap on its financial exposure, but ensured that the class members would not be penalized for high participation.  Second, because the per claimant recovery was tied to the number of calls received (though abated pro rata once the cap was exceeded), the compensation class members received was proportional to the injury they experienced.

Second, in Parker v. Universal Pictures, No. 6:16-cv-1193-Orl-41DCI, the court approved a settlement program where the settlement fund maxed out at $19.2 million.  (Docket No. 16-cv-1193-Orl-41DCI, ECF 166 at 5.)[17]  The settlement program set maximum per claimant award amounts for each of the four classes certified in the litigation ($35 for the ATDS class, and $50 for three other classes).  (Id.)  The settlement provided that "[t]he amount of each claim may be reduced pro-rata if the total amount required to pay each claim exceeds the net amount that remains available in the Settlement Fund after payment of Plaintiffs' service awards, attorney fees and

---

[17] Docket No. 16-cv-1193-Orl-41DCI, ECF 166 is Magistrate Judge Daniel C. Irick's Report and Recommendation. District Court Judge Carlos E. Mendoza "agree[d] with the analysis in the Report and Recommendation," and therefore adopted the Report and Recommendation and preliminarily approved the settlement program.  (Docket No. 16-cv-1193-Orl-41DCI, ECF 169.)  The Parker court subsequently granted final approval citing "the reasons set forth in the Report and Recommendation."  (Docket No. 16-cv-1193-Orl-41DCI, ECF 173 at 2.)

costs, and settlement administration expenses." (<u>Id.</u>)  The settlement in <u>Parker</u> is notable because it distributed the settlement fund based on the injury experienced, rather than the fortuity of the participation rate.  Like the <u>Charvat</u> settlement, the <u>Parker</u> settlement set a ceiling at which the settlement fund would max out, though it did not set a minimum value (instead, it set maximum per claimant awards).

With this backdrop in mind, the Court now analyzes the terms of the proposed settlement.

## V.    Discussion

The Third Circuit applies a presumption of fairness when reviewing a proposed settlement if four conditions are satisfied.  The substance of a proposed class action settlement is then evaluated by "applying the <u>Girsh</u> factors, applying the <u>Prudential</u> factors where applicable, and also considering the degree of direct benefit provided to the class [i.e., the <u>Baby Products</u> considerations]."  <u>In re Google Inc. Cookie Placement Consumer Privacy Litig.</u>, 934 F.3d 316, 329 (3d Cir. 2019) (internal quotation marks and citations omitted).[18]  Here, the requirements for the initial presumption of fairness are not satisfied, and both the <u>Girsh</u> and <u>Prudential</u> considerations favor denying approval of the settlement.  Further, the <u>Baby Products</u> considerations do not strongly suggest that the settlement should be either approved or denied.

---

[18] The Third Circuit's instruction to apply the <u>Girsh</u> factors, <u>Prudential</u> considerations, and <u>Baby Products</u> considerations postdates the 2018 amendments to Rule 23.  Accordingly, the Court will adhere to this direction and analyze the fairness, reasonableness, and adequacy of the proposed settlement under the Third Circuit's framework, recognizing that this analysis addresses the "core concerns" identified in Rule 23(e)(2).  <u>See</u> <u>In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.</u>, No. 09-md-2034, 2019 WL 4645331, at *11 n.10 (E.D. Pa. Sept. 24, 2019) (Brody, J.) ("[T]his Court will apply the <u>Girsh</u> factors, the relevant <u>Prudential</u> considerations, and <u>the Baby Products</u> direct benefit consideration to determine whether to approve the [s]ettlement, with the understanding that these factors and considerations amply address 'the core concerns and procedure and substance' listed in the amended Rule 23(e)(2)."); <u>Myers v. Jani-King of Phila., Inc.</u>, No. 09-1738, 2019 WL 4034736, at *7 n.4 (E.D. Pa. Aug. 26, 2019) (Surrick, J.) ("We will focus our consideration on the <u>Girsh</u> factors and address any factor under [amended] Rule 23 that is not addressed by <u>Girsh</u>.").

A.      **Initial Presumption of Fairness**

The Third Circuit has held that a presumption of fairness attaches to a proposed settlement if "(1) the negotiations occurred at arm's-length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 436 (3d Cir. 2016). That presumption does not apply here because the second element—sufficient discovery—is not satisfied.

Class Counsel represents that "informal discovery" was exchanged before the first mediation session, and that "confirmatory formal discovery" followed the agreement in principle that was reached after the second mediation session. (Plaintiff's Final Approval Memorandum at 1.) However, this discovery was preliminary and focused on the settlement. The Court is not satisfied that the exchange gave "[c]lass counsel … a strong grasp of the legal hurdles that [p]laintiffs would face in order to succeed on their claims." Comcast Corp., 2019 WL 4645331, at *11. There was no briefing on the substantive issues that would have narrowed the obstacles Plaintiff may have faced in establishing liability, nor was there significant discovery to ensure Class Counsel "[was] aware of the strength and weaknesses of their case." National Football League, 821 F.3d at 436. While informal discovery that permits "class counsel to assess the value of the class' claims and negotiate a settlement that provides fair compensation" may be enough, the informal discovery here was far more preliminary and did not include investigation into the merits. Id. Therefore, the second element is not satisfied, and because the test is phrased conjunctively, the initial presumption in favor of the settlement does not apply.[19]

---

[19] The other three elements are satisfied. As to the first element, the parties engaged in two rounds of arm's-length settlement negotiations before Judge Rosen. (Plaintiff's Final Approval Memorandum at 1.) An agreement in principle was reached after the second mediation session, leading to further negotiations and confirmatory discovery that resulted in a final agreement. (Id.) The parties also engaged in discussions with the Master, whose important

B.      **Girsh** Factors

In Girsh v. Jepson, the Third Circuit explicated nine nonexhaustive factors that a district

court should weigh in evaluating the fairness of a class settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of
> the class to the settlement; (3) the stage of the proceedings and the amount of
> discovery completed; (4) the risks of establishing liability; (5) the risks of
> establishing damages; (6) the risks of maintaining the class action through the trial;
> (7) the ability of the defendants to withstand a greater judgment; (8) the range of
> reasonableness of the settlement fund in light of the best possible recovery; and (9)
> the range of reasonableness of the settlement fund to a possible recovery in light of
> all the attendant risks of litigation.

521 F.2d at 157.

Of the nine Girsh factors, some favor approving the settlement, and others are neutral or

weigh against approval.  On balance, the Girsh factors weighing against approval outweigh the

factors in favor of approval, indicating that the settlement should be rejected.

### 1. Complexity, Expense and Likely Duration of Litigation

The first Girsh factor considers "the probable costs, in both time and money, of continued

litigation."  In re Cendant Corp. Litig., 264 F.3d 201, 233 (3d Cir. 2001).  If a case requires

"complex and protracted discovery, extensive trial preparation, and difficult legal and factual

issues," the first Girsh factor favors approval of the settlement.  Id.

If there is no settlement in this case, the parties will bear normal litigation expenses

associated with completing discovery (i.e., producing and reviewing documents, and taking

depositions), preparing or responding to a class certification motion, preparing or opposing a

---

conclusion that the settlement resulted from arm's-length negotiation is entitled to respect and is approved.  Therefore,
the first element is satisfied.  The third element is satisfied because the Court previously determined that Class Counsel
was "competent, capable of exercising all responsibilities as Class Counsel and [would] fairly and adequately represent
and protect the interests of the absent Class Members."  (Preliminary Approval Order ¶ 8.)  The fourth element is
satisfied because only four potential class members chose to opt out of the settlement.  (Plaintiff's Final Approval
Memorandum at 6.)

motion for summary judgment, trying the case to a jury, and potentially litigating appealable issues. Additionally, if the litigation continues the parties may need to retain expert witnesses, which will impose an additional expense. Plaintiff's Final Approval Memorandum reveals that there are two issues that are in contention: whether Flagship had consent and whether the calls were made using an ATDS. Plaintiff's Final Approval Memorandum does not indicate that discovery on either of these issues would be overly burdensome or require costly experts. Cf. Vasco v. Power Home Remodeling Grp. LLC., No. 15-4623, 2016 WL 5930876, at *5 (E.D. Pa. Oct. 12, 2016) (Kearney, J.) (noting that discovery on the defendant's dialing system "would require each party to hire technical experts at significant cost" and ultimately concluding that the first Girsh factor "weigh[ed] in favor of settlement, but not heavily because of the lack of complexity [of the consent question]"). As discussed in subsection V.B.3, the early posture in which this case settled—before an answer or Rule 12 motion was filed—has deprived the Court of an understanding of the merits of the case. It is difficult to predict the complexity and expense of continued litigation, but given that little progress has been made on the merits, it is likely that the cost would be considerable. Therefore, this factor likely favors approval, but the proper weight cannot be assessed given the lack of information in the record.

### 2. Reaction of the Class to the Settlement

The second Girsh factor "attempts to gauge whether members of the class support the settlement." In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 536 (3d Cir. 2004). One metric to assess this factor is "the number of objectors … in light of the number of notices sent and claims filed." Cendant, 264 F.3d at 234. Here, of the approximately 327,000 notified, potential class members, only four opted out of the settlement, and none objected. These low numbers indicate that the second Girsh factor favors approval. See, e.g., id. at 235 ("The vast disparity between the

number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement.").

Moreover, as highlighted by counsel, the 20.5% participation rate is "a very high claims rate and the benefits to the class will be widely dispersed far more than in an average TCPA class settlement."[20]  (First Supplemental Submission at 4.)  The 20.5% participation rate here exceeds the participation rates in two TCPA settlements that were recently approved by judges in this district, see Brown, 2017 WL 4102586, at *4 (participation rate of 7.3%); Vasco, 2016 WL 5930876, at *2 (participation rate of 9%), and far surpasses the participation rates of settlements in TCPA cases that were approved by courts in other districts, see, e.g., Gehrich v. Chase Bank USA, N.A., 316 F.R.D. 215, 223 (N.D. Ill. 2016) (participation rate of 1.08%); Couser v. Comenity Bank, 125 F. Supp. 3d 1034, 1044 (participation rate of 7.7%); Bayat, 2015 WL 1744342, at *5 (participation rate of 1.9%).

Given the high participation rate and the exceedingly low number of opt outs, it is evident that the class generally had a positive reaction to the settlement, which means that the second Girsh factor weighs in favor of approval.

### 3. Stage of Proceedings and Amount of Discovery Completed

The third Girsh factor "captures the degree of case development that class counsel have accomplished prior to settlement."  General Motors, 55 F.3d at 813.  This factor does not favor approving the settlement because there was little or no substantive merits briefing and/or discovery that would have enabled counsel to "adequate[ly] appreciate[e] … the merits of the case before negotiating."  Id.  First, Flagship never answered or filed a dispositive motion before the parties

---

[20] The concerns raised in subsection IV.C.1—considering the incongruity between, on the one hand, emphasizing high participation (which furthers the public interest in holding TCPA violators liable) and, on the other, allowing high participation to reduce the award each individual class member receives (which undermines Congress's determination that injured individuals are entitled to statutory damages of $500 per violation)—remain.

commenced settlement discussions.  Second, no depositions were taken by either side to explore potential strengths or weaknesses of the opposing party.[21]  Third, Class Counsel represents that the parties exchanged "ample evidence (related to merits, class issues and damages) in formal and informal discovery and through the mediation process," but counsel's description of the information Flagship produced indicates that the production was primarily focused on class data. (Plaintiff's Final Approval Memorandum at 10-11.)  Although "formal discovery is not a requirement for the third <u>Girsh</u> factor," class counsel must have "developed enough information about the case to appreciate sufficiently the value of the claims."  <u>National Football League</u>, 821 F.3d at 439.  Class Counsel's description of the nature of discovery indicates that there may not have been sufficient information to enable counsel to adequately appraise the claims.

Because "post-discovery settlements are more likely to reflect the true value of the claim and be fair," the Court is not convinced that counsel could fully assess the fairness of the settlement given the early posture during which the parties reached agreement.  <u>Bell Atl. Corp. v. Bolger</u>, 2 F.3d 1304, 1314 (3d Cir. 1993); <u>see also</u> <u>In re Capital One Tel. Consumer Prot. Act Litig.</u>, 80 F. Supp. 3d 781, 792-93 (N.D. Ill. 2015) (finding that the case sufficiently progressed where the parties engaged in "substantial motion practice and discovery" in two individual actions before transfer occurred and there was a six-month exchange of discovery that permitted meaningful settlement discussions); <u>In re Ravisent Techs., Inc. Sec. Litig.</u>, No. 00-1014, 2005 WL 906361, at *8 (E.D. Pa. Apr. 18, 2005) (Surrick, J.) (finding that third <u>Girsh</u> factor favored approval because "the settlement occurred at a stage where the parties certainly had a clear view of the strengths and weaknesses of their cases") (internal quotation marks and citations omitted).  <u>Compare</u> <u>Myers</u>,

---

[21] Plaintiff's Final Approval Memorandum notes that "Plaintiff conducted a Rule 30(b)(1) deposition of [Flagship's account records declarant] to confirm the size of the class and origin of the class data."  (<u>Id.</u> at 10-11.)  However, this deposition presumably was confined to the declarant's record keeping process and did not relate to the merits.

2019 WL 4034736, at *8 (finding that third <u>Girsh</u> factor favored approving the settlement because "the parties completed discovery and filed summary judgment briefs prior to engaging in settlement negotiations"), <u>with</u> <u>General Motors</u>, 55 F.3d at 814 (concluding that third <u>Girsh</u> factor disfavored settlement because "the inchoate stage of case development reduce[d] [the court's] confidence that the proceedings had advanced to the point that counsel could fairly, safely, and appropriately decide to settle the action"); <u>Arrington v. Optimum Healthcare IT, LLC</u>, No. 17-3950, 2018 WL 5631625, at *7 (E.D. Pa. Oct. 31, 2018) (Surrick, J.) (concluding that third <u>Girsh</u> factor "neither weigh[ed] in favor of, nor against, approval" because "the parties [did not] engage[] in any … discovery … to assist class counsel in evaluating the merits of the claims and defenses"). Because Plaintiff and Flagship reached a settlement before there was meaningful inquiry into the merits, this factor weighs heavily against approving the settlement.

### 4 & 5. Risks of Establishing Liability and Damages

"The fourth and fifth <u>Girsh</u> factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." <u>In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions</u>, 148 F.3d 283, 319 (3d Cir. 1998). Thus, these factors look to "the potential rewards (or downside) of litigation … had class counsel elected to litigate the claims rather than settle them," and the "expected value of litigating the action rather than settling it at the current time." <u>General Motors</u>, 55 F.3d at 814, 816.

As noted in subsections IV.B.1–2, there are many unresolved questions involving the TCPA that make litigating a risky proposition. The question on which the Supreme Court recently granted certiorari—the constitutionality of the government-debt exception to the TCPA—is not at issue here. However, as explored in subsection IV.B.1, the uncertainty regarding the definition of

an ATDS remains a live question on which there is genuine difference of opinion amongst the courts of appeals and complicates the likelihood of establishing liability.

Additionally, Flagship's liability depends in part on whether Plaintiff can establish that Flagship used "predictive dialers."[22]  Plaintiff alleges in his Complaint that after answering calls from Flagship, he heard silence on the line before his call was transferred to a live agent, and that this is indicative of the use of a predictive dialer.  (ECF 1, Compl. ¶ 22.)  Plaintiff further alleges that use of a "predictive dialer" is within the scope of the FCC's definition of an ATDS.  (Id. ¶ 23.)  However, whether a predictive dialer can be an ATDS when the dialer lacks the capacity to generate phone numbers randomly or sequentially is an unsettled question.  See Thompson-Harbach v. USAA Fed. Sav. Bank, 359 F. Supp. 3d 606, 620-22 (N.D. Iowa 2019) (collecting cases illustrating the divergence in views).  Compare id. at 621 (holding that "ACA International … necessarily invalidated the FCC's 2003 Order and 2008 Declaratory Ruling insofar as the 2003 Order and 2008 Declaratory Ruling also define a predictive dialer as an ATDS, even when the predictive dialer lacks the capacity to generate phone numbers randomly or sequentially and to then dial them"), with Pieterson v. Wells Fargo Bank, N.A., No. 17-2306, 2018 WL 3241069, at *3 (N.D. Cal. July 2, 2018) ("ACA Int'l vacated the 2015 Declaratory Ruling but it did not clearly intend to disturb the FCC's 2003 and 2008 orders.").  Whether the predictive dialers here "are quintessential dialers which meet the definition of ATDS," as Plaintiff argues, is another layer of complexity and uncertainty that Plaintiff faces in establishing liability.  (Second Supplemental Submission at 3.)

---

[22] The Class Definition includes three specific dialers: TCN, LiveVox, and Aspect.  (Final Approval Memorandum at 2.)  Class Counsel represents that "[t]o be successful for the Class, Plaintiff would need to show … that these systems were all ATDS."  (Second Supplemental Submission at 2) (emphasis added).

Finally, it is possible that future FCC action could strengthen or adversely affect the viability of Plaintiff's TCPA claims.  (Plaintiff's Final Approval Memorandum at 11.)  Although the May FCC Notice and the October FCC Notice solicited comment on the definition of ATDS following the D.C. Circuit's invalidation of the 2015 Order in <u>ACA International</u> and the Ninth Circuit's decision in <u>Marks</u>, the FCC has not provided further guidance.  If the FCC were to refine its interpretation of ATDS in a way that restricts Plaintiff's claims, the recovery could be reduced, so the potential for adverse FCC action is another risk that Plaintiff faces in establishing liability.

The Court "give[s] credence to the estimation of the probability of success proffered by class counsel, who [is] experienced with the underlying case, and the possible defenses which may be raised" and accepts counsel's assertion that establishing liability would be risky.  <u>Lachance v. Harrington</u>, 965 F. Supp. 630, 638 (E.D. Pa. 1997) (Yohn, J.).  Of course, Class Counsel is not a disinterested participant in this litigation—they will receive a generous attorney's fee award in excess of one million dollars if the proposed settlement plan is fully approved.  <u>See, e.g.</u>, <u>Brown v. Rita's Water Ice Franchise Co. LLC</u>, 242 F. Supp. 3d 356, 357-58 (E.D. Pa. 2017) (Savage, J.) (noting that "[c]lass counsel's interest in maximizing compensation may collide with the interest of the class members who will receive insignificant or nominal sums").  Therefore, although these factors generally favor approval, there are countervailing considerations.

### 6. Risks of Maintaining the Class Action Through Trial

The sixth <u>Girsh</u> factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial."  <u>Warfarin</u>, 391 F.3d at 537.  Because Rule 23 permits modification of class certification, this factor may favor approval if concerns about manageability implicate a real risk of decertification.  <u>See, e.g.</u>, <u>id.</u> ("Although … concerns about the manageability of [the class] … did not pose a problem for the certification of a settlement class,

there is a significant risk that such a class would create intractable management problems if it were to become a litigation class, and therefore be decertified.").  However, "this factor becomes essentially 'toothless' [in a class settlement] because a district court need not inquire whether the case, if tried, would present intractable management problems for the proposal is that there be no trial."  National Football League, 821 F.3d at 440.  Therefore, this factor deserves "only minimal consideration."  Id.

Plaintiff correctly notes that this case was certified only for settlement purposes, and that obtaining certification for litigation purposes poses a much more significant hurdle.  (Plaintiff's Final Approval Memorandum at 12-13.)  One potential obstacle that Plaintiff may face in obtaining and maintaining class certification for litigation purposes is demonstrating that Flagship's anticipated consent defense can be established class-wide, and that the defense does not create individual issues that predominate over common ones.  (Second Supplemental Submission at 6.)  As noted, Flagship has not briefed the consent issue—the Court's information comes from Class Counsel's representations in the Second Supplemental Submission—so it is difficult to forecast how significant a hurdle this would pose.  To the extent the sixth Girsh factor favors the settlement, it will not be given much weight.

### 7. Ability of Defendant to Withstand a Greater Judgment

The seventh Girsh factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement."  Cendant, 264 F.3d at 240.  This factor "is most relevant when the defendant's professed inability to pay is used to justify the amount of the settlement."  National Football League, 821 F.3d at 440.  This factor is relevant here because Plaintiff cited financial instability as one justification for the size of the settlement fund.  See

Second Supplemental Submission at 7 ("[Flagship's] resources and ability to fund more in settlement was … a significant factor in the overall settlement amount) (emphasis added).

Class Counsel represented that "[b]ased on the financial disclosures that Flagship provided, [counsel] does not believe that the Defendant could withstand a greater judgment without significant and severe harm to its prospects as a going concern."[23]  (Plaintiff's Final Approval Memorandum at 13.)[24]  The Master also examined Flagship's financials, and concluded that "although the settlement amount, $4,000,000, is a very small percentage of the $2.5 billion of listed assets of the company, the margin upon which it operates is slim and was properly investigated and taken into account by Class Counsel."  (Master's Settlement Report at 3.)  However, the Court conducted an in camera review of financial statements provided by Flagship for both Flagship and its parent, FC HoldCo LLC, and does not agree that a settlement in excess of $4 million would cause "significant and severe harm."  (Plaintiff's Final Approval Memorandum at 13); see also ECF 47, Jan. 13, 2020 Hr'g Tr. 16:18-20 ("[H]aving looked at the financial statements, I can tell you that $4 million is a very small number compared to what … in my view, the Defendant could afford.").

The Court is also concerned that, given Flagship's status as a private company, class members had no ability to independently verify the truth of Class Counsel's assertion that $4 million was all Flagship could afford.  See id. 17:12-15 ("[T]he fact that there was no … discovery in public and the fact that there's no financial information about the Defendant in public … gives

---

[23] In addition to reviewing Flagship's financials, Class Counsel interviewed Jennifer Bernadino, Flagship's chief accounting officer.  (ECF 34-1, Decl. of Stephen Taylor ¶ 4.)  This interview "confirmed what had been represented to Plaintiff's counsel during the mediation that Flagship could not reasonably afford a settlement, let alone a judgment, materially different from what had been agreed."  (Id. ¶ 6.)

[24] The preliminary approval papers, which focused on the settlement as compared to other TCPA settlements, omitted reference to Flagship's financial resources and its ability to pay.  If these statements had been before the Court at the time of preliminary approval, they would have created doubt as to the propriety of granting preliminary approval.

me great concern.").[25]  Flagship's most recent press release reported that its portfolio of managed receivables has grown to $2.9 billion, so class members may reasonably be left wondering why a company with almost $3 billion in assets can only afford a $4 million settlement.[26]  Flagship explained that disclosing financial information to the class members may put it at a competitive disadvantage and/or negatively affect its prospects in a future equity event, but these concerns cannot excuse total silence on the topic of Flagship's ability to pay.  The only information class members had was Class Counsel's representation that Flagship "was not willing or able to pay more to settle the case, would have paid nothing if it prevailed, and if Plaintiff prevailed [Flagship] would go bankrupt." (Plaintiff's Final Approval Memorandum at 13-14.)[27]  The Court cannot agree to the accuracy of the last part of that communication.

Finally, although Class Counsel represented that Flagship, during the mediation, stated it did not have insurance to pay a claim in connection with this litigation, there was no interrogatory or document request about insurance, nor did Class Counsel seek confirmation of this representation from Flagship's insurer.  Cf. Ocwen I, 2018 WL 4659274, at *5 ("Class counsel consulted with insurance coverage counsel and were reasonably satisfied that th[e] barrier to insurance coverage was insurmountable.").  The Court is not prepared to accept at face value Class Counsel's claim that there was no insurance, which weighs against finding Flagship is not able to withstand a greater judgment.  See id. (noting that because defendant "blew the deadline for giving its insurer

---

[25] Some cases have held that where "the parties have not presented evidence concerning [the] [d]efendant's ability to withstand a greater judgment," the ability to pay factor is neutral.  Galt v. Eagleville Hosp., 310 F. Supp. 3d 483, 495 (E.D. Pa. 2018) (Rufe, J.).  However, here the parties have presented evidence of Flagship's ability to pay, albeit confidentially, and the Court cannot ignore the conclusion that it points to.

[26] Press Release, Flagship Credit Acceptance LLC, Flagship Credit Acceptance Welcomes New CEO, Board Member (July 18, 2019), https://www.flagshipcredit.com/news/detail/flagship-credit-acceptance-welcomes-new-ceo-board-member.  The Master's Settlement Report also noted that the "listed assets" of Flagship are $2.5 billion.  (Master's Settlement Report at 3.)

[27] Class members had access to Plaintiff's Final Approval Memorandum on the settlement website and on the public docket.  There were no disclosures about Flagship's inability to pay a larger judgment in the notices sent to the class.

notice of the [TCPA] claim," plaintiffs faced a real risk that defendant would not be able to satisfy a judgment following contested litigation); Vasco, 2016 WL 5930876, at *6 (noting that defendants' "limited insurance coverage" supported its claim that it would not be able to withstand a judgment greater than the settlement amount).

Because the Court is of the opinion that Flagship could withstand a greater judgment, is concerned about the private nature of the disclosures, and is not satisfied with the record on the issue of whether Flagship has insurance for Plaintiff's TCPA claim, the seventh Girsh factor weighs heavily against approval.

### 8 & 9. Range of Reasonableness of Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation

The eighth and ninth Girsh factors assess "whether the settlement represents a good value for a weak case or a poor value for a strong case." Warfarin, 391 F.3d at 538. These factors "test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." Id. Assessing this factor requires comparing "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing" with "the amount of the proposed settlement." General Motors, 55 F.3d at 806. The Court continues to consider "[t]he eighth and ninth Girsh factors … most relevant to the analysis of the reasonableness of this settlement," and finds that these factors require rejection of the agreement. (May 9, 2019 Memorandum at 4.)

### a.    Reasonableness in Light of Best Possible Recovery

The Court is not satisfied that the $4 million amount the parties settled on is reasonable in light of best possible recovery. Four considerations motivate this conclusion: (i) comparison of the settlement in this case to that in Snyder v. Ocwen; (ii) an analysis of the features of other class settlements under the TCPA; (iii) consideration of the scope of Plaintiff's potential damages; and

(iv) the de minimis nature of the $35.30 per claimant recovery.

### i.      Comparison to <u>Snyder v. Ocwen</u>

<u>Snyder v. Ocwen</u> is instructive on the reasonableness of the settlement in light of the best possible recovery.  The plaintiff in <u>Ocwen</u>, who alleged that a loan servicer's automated debt collection calls violated the TCPA and FDCPA, sued both the loan servicer and the banks on whose behalf the debt-collection calls were made.  2018 WL 4659274, at *1.  The court granted preliminary approval of the parties' agreement to settle the claims for $17,500,000, with the settlement fund to be distributed as follows: $1,600,000 to pay costs of notice and administration; $5,289,250 to pay attorney's fees (a one-third attorney's fee award); $75,000 to pay a net incentive award to the three named plaintiffs; and the remaining $10,535,750 to pay the class members, with each claimant receiving about $39.  <u>Id.</u> at *2.  The settlement agreement also provided for dismissal of the suit against the banks.  <u>Id.</u>

The district court judge refused to grant final approval of this settlement, finding that based on the existing record, "there is a good chance that class counsel have sold the case short."  <u>Id.</u> at *6.  Two concerns motivated the decision to deny final approval: first, concerns about "the extent to which [the defendant's] claim of relative inability to pay is supported and justifies the particular settlement amount proposed;" and second, concern that as part of the proposed settlement, the claims against the banks would be dismissed without the banks making any payment or providing other consideration.  <u>Id.</u>

Following the denial of final approval in <u>Ocwen I</u>, the plaintiffs submitted for approval an amended settlement that increased the settlement fund by $4 million (from $17,500,000 to $21,500,000); reduced attorney's fees by $500,000 (from $5,289,250, or 30.29% of the settlement fund, to $4,789,250, or 22.2% of the settlement fund); and did not release the claims against the

banks.  Snyder v. Ocwen Loan Servicing, LLC, No. 14 C 8461, 2019 WL 2103379, at *7 (N.D. Ill. May 14, 2019) ("Ocwen II").  The result of the amendments was that an additional $4,500,000 was available for distribution to the claiming class members, increasing the per claimant recovery from $39 (the per claimant recovery under the rejected agreement) to $53–$74 (the per claimant recovery under the amended, approved agreement).  Id.  The Ocwen II court approved the settlement as amended, finding that because the revised agreement represented "a considerable improvement in the value of the settlement in both absolute and relative terms," the factor comparing "the strength of the case … with the settlement offer" favored approval.  Id. at 7, 8.

Although Ocwen I's concern about gratis dismissal of certain defendants is not implicated here, the skepticism of the settlement amount is directly on point.  As in Ocwen I, the minimal factual record disputes Class Counsel's contention that Flagship can withstand a judgment of $4 million—but no greater.

The parties have not documented or explained why $4 million is feasible for Flagship, but a higher number is not.  See Ocwen I, 2018 WL 4659274, at *5 ("[Defendant's] inability to pay a billion-dollar adverse judgment does not explain the particular settlement figure the parties arrived at—$17,500,000, which is far less than a billion-dollar jury award.").  According to Plaintiff's calculations, if Plaintiff were to prove that Flagship violated the TCPA "one time for each of the approximately 327,924 class members, the damages would be $163,962,000 to $491,886,000." (Second Supplemental Submission at 7.)  There is a large gap between $4,000,000 and $163,962,000, and Class Counsel has not adequately explained why Flagship can withstand a judgment of up to $4 million but no greater.

It is axiomatic that "the essence of settlement is compromise."  Gehrich, 316 F.R.D. at 228. However, the Court takes seriously its role as a "protector of the absentees' interests" and is not

persuaded that the $4 million settlement presented by the parties is reasonable—especially considering that under this agreement each claiming class member will receive only a small fraction of what Congress has said they are statutorily entitled to. General Motors, 55 F.3d at 784; see also id. at 820 (noting the "danger that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees").

### ii.    Consideration of Other TCPA Settlements

Class Counsel list a number of TCPA cases where the per claimant recovery was less than or comparable to the $35.30 per claimant recovery here. See First Supplemental Submission at 2 (listing six cases where per claimant recovery ranged from $30–$47). However, there are other TCPA cases where per claimant recovery was higher. See, e.g., Bowman v. Art Van Furniture, Inc., No. 17-11630, 2018 WL 6445389, at *5 (E.D. Mich. Dec. 10, 2018) (per claimant recovery of $98.87); Brown, 2017 WL 4102586, at *4 (per claimant recovery of $144); Ott, 2016 WL 54678, at *1 (per claimant award of $140.86); Bayat, 2015 WL 1744342, at *5 (per claimant recovery of $151); Wilkins v. HSBC Bank Nev., N.A., No. 14 C 190, 2015 WL 890566, at *12 (N.D. Ill. Feb. 27, 2015) (per claimant recovery of $101.94); see also Rose v. Bank of Am. Corp., No. 5:11-2390, 2014 WL 4273358, at *10 (N.D. Cal. Aug. 29, 2014) ("[An average per claimant recovery in] the $20 to $40 range falls in the lower range of recovery achieved in other TCPA class action settlements.").

Another area where TCPA settlements differ is the amount of the settlement fund—in many of the TCPA cases discussed in this Memorandum, the value of the settlement fund was higher than the $4 million proposed here. See, e.g., Gehrich, 316 F.R.D. at 227 (settlement fund of $34 million); Kolinek v. Walgreen Co., 311 F.R.D. 483, 493 (N.D. Ill. 2015) (settlement fund of $11 million); Capital One, 80 F. Supp. 3d at 787 (settlement fund of $75 million); Ocwen II, 2019 WL

2103379, at \*7 (settlement fund of $21,500,000); <u>Wright v. Nationstar Mortg. LLC</u>, No. 14 C

10457, 2016 WL 4505169, at \*2 (N.D. Ill. Aug. 29, 2016) (settlement fund of $12.1 million);

<u>Duchene v. Westlake Servs., LLC</u>, No. 2:13-cv-1577, 2016 WL 6916734 (W.D. Pa. July 14, 2016)

(referencing Docket 13-cv-1577, ECF No. 123) (settlement fund of $10 million).

These comparisons simply confirm that the facts and circumstances of each TCPA

settlement are unique.  The particularities of the various metrics that are used to compare and

contrast TCPA settlements (e.g., the participation rate, the amount of per claimant recovery, the

number of class members, and the size of the settlement fund) are best addressed in the context of

the framework set forth by the Third Circuit for evaluating proposed settlements: the <u>Girsh</u> factors,

<u>Prudential</u> considerations, and <u>Baby Products</u> inquiry.  See <u>Google</u>, 934 F.3d at 328 ("[S]ettlement

approval should be a practical inquiry rooted in the particular case's facts and procedural posture—

as the <u>Girsh</u> and <u>Prudential</u> factors reflect.").  For example, in the $75 million <u>Capital One</u> TCPA

settlement that is referenced above, the settling defendant was a company that is much larger than

Flagship and has many billions of dollars in assets.  Therefore, simply comparing that case to this

one in terms of the value of the settlement fund obscures one very important difference: the

disparity in the amount of resources available to Capital One versus Flagship.  The seventh <u>Girsh</u>

factor is designed to capture and adjust for this difference.  Therefore, the focus should be on the

factors and considerations that the Third Circuit has articulated.  Paying too much attention to any

of the TCPA metrics risks straying from this task.

### iii.    Plaintiff's Potential Damages

Assessing reasonableness in light of the best possible recovery necessarily requires

analyzing the potential damages that might be obtained if Plaintiff successfully establishes

liability.  As noted, this task is complicated by the absence of information in the record that would

permit the Court to evaluate Plaintiff's potential for success on the merits.  However, assuming that liability could be established, the damages computation is relatively easy because under the TCPA, each class member is entitled to $500 per call (this amount would be trebled if Plaintiff successfully showed the violation was willful).  Taking a simple example, imagine that all 67,255 class members proved to the satisfaction of the jury or court that they each received 10 of Flagship's robocalls.[28]  Each class member would be statutorily entitled to $5,000.[29]  Compared to the $35.30 per claimant award under the proposed agreement, the de minimis nature of the settlement appears obvious.  Indeed, even if each class member only established that they received one phone call, the $35.30 per claimant award still pales in comparison to the TCPA's guarantee of $500.

### iv.     Per Claimant Recovery of $35.30 is De Minimis

The Court's view that $35.30 is de minimis in light of the range of possible recoveries is confirmed by considering the expenses that telephone users face.  By definition, a person who receives a robocall has a telephone and pays a monthly fee to the phone company for that phone service.  To pay for a cellphone in 2020, the individual rate will vary, but the Court will assume that the average class member spends at least $50/month or $600/year on cell phone services.  Comparing the $35.30 per claimant award under the proposed settlement to the estimated $600/year that each class member spends to service their telephone confirms that the award is so low as to be inconsequential in light of the cost that the class member faces in basic maintenance

---

[28] The assumption that each class member received ten calls is purely hypothetical.  Nothing in the papers identifies the number of calls that Flagship is alleged to have made or averages that number across the class members.

[29] Flagship's total liability would be astronomical in this hypothetical; they would be liable for a judgment of roughly $336,275,000 (67,255 class members x 10 calls x $500/call).  And if Plaintiff is successful in his theory that Flagship is liable for four years of robocalls, Flagship's potential exposure may be much larger.  Although a trial judgment may indeed force Flagship into bankruptcy, it is likely that the class members would have an enforceable judgment that may take priority over claims of other creditors and shareholders.  A number of results could follow, including the possibility of a receiver being appointed to operate Flagship's business on behalf of the victorious class members.

expenses.  The point is that for each class member—who suffered the annoyance of Flagship's robocalls and must pay at least $600/year in phone costs—an award of $35.30 is simply trivial in light of a possible recovery of $500, discounted for the cost of maintaining the action to judgment.

As the appended chart demonstrates, some federal judges have approved settlements that resulted in exceedingly low per claimant recoveries.  See, e.g., Hashw, 182 F. Supp. 3d at 944 (per claimant recovery of $33.20); Kolinek, 311 F.R.D. at 493 (per claimant recovery of $30); Couser, 125 F. Supp. 3d at 1040 (per claimant recovery of $13.75).  Some of these settlements may fall into the "de minimis" category, and the Court acknowledges Plaintiff's contention that some judges have approved TCPA settlements that result in minimal per claimant amounts.  However, given the other circumstances detailed in this Memorandum, this Court declines to approve a de minimis settlement in this case.

A final consideration supporting this Court's view that $4 million is not reasonable in light of the best possible recovery is the size of the settlement fund relative to the size of most other TCPA settlement funds.  Only three of the TCPA cases in the Court's chart featured settlement funds that were lower than $4 million.  See Brown, 2017 WL 4102586, at *1 (settlement fund of $3 million); Bayat, 2015 WL 1744342, at *1 (settlement fund of $3,354,745.98); Grannan, 2012 WL 216522, at *1 (settlement fund of $1 million).  However, all of those cases importantly resulted in awards that were substantially higher than the $35.30 per claimant here.  See Brown, 2017 WL 4102586, at *3 (per claimant recovery of $144); Bayat, 2015 WL 1744342, at *5 (per claimant recovery of $151); Grannan, 2012 WL 216522, at *7 (per claimant recovery of $300–$325).

The Court has considered Class Counsel's argument that, when adjusted for the 20.5% participation rate, only Brown had a higher per claimant recovery.  However, this is not persuasive because it effectively punishes the members of the class for a high participation rate.  If the Court

looked only to the 20.5% participation rate <u>without</u> considering the mathematical reality that a high level of participation will reduce per claimant recoveries, the Court would be disregarding Rule 23(e)(2)'s requirement that a settlement be "fair, reasonable and adequate."  Moreover, there is tension in relying on a high participation rate to justify a settlement that results in low recoveries at the individual level when Congress determined that a legitimate TCPA claim is worth, at a minimum, $500.  A high participation rate is not inherently bad; to the contrary, a strong showing of engagement is laudable.  However, where high participation results in per claimant awards that are de minimis, participation cannot independently establish fairness and reasonableness.

### b.    Reasonableness in Light of Risks if Case Went to Trial

There is nothing in the record regarding Flagship's contentions.  Therefore, this Court cannot assess the risks the parties would face if the case proceeded to trial.  Because Flagship never answered the Complaint, the Court is unable to meaningfully evaluate the merits to determine whether this case is a "weak" or a "strong" one.  Indeed, Plaintiff lists Flagship's "anticipated defenses, as argued by [Flagship] to [Plaintiff] during settlement discussions and [the] mediation before Judge Rosen: (1) [Flagship] ha[d] the prior express consent of class members to make automated calls and (2) that defense impacts the certification requirements of Fed. R. Civ. P. 23." (Second Supplemental Submission at 4.)

The Second Supplemental Submission discusses Plaintiff's characterization of Flagship's position on the consent question and provides Plaintiff's response, but this is far from the type of fulsome briefing that would permit the Court to reach an informed opinion about the merits of the issue.  Additionally, Plaintiff alleges that Flagship "repeatedly placed automated calls using an ATDS to Plaintiff's cellular telephone," (Compl. ¶ 15), while Class Counsel states that Flagship "vehemently disagrees" with Plaintiff's characterization of the dialers as ATDS, (Second

41

Supplemental Submission at 3.)  As discussed in subsection IV.B.1, the term "ATDS" is fraught with complexity, and meaningfully addressing the applicability of the unsettled definition to this case is impossible without understanding the substance of Flagship's position.  Cf. Ocwen I, 2018 WL 4659274, at *5 (referencing prior rulings on the consent issue in a previous preliminary injunction ruling and noting that these holdings informed the court's conclusion that "[o]n the issue of consent, plaintiffs had a strong position on the merits," though the issue may still have impacted the class certification question).

In sum, the Court cannot assess whether the $4 million settlement provides "good value" for the claims without having a greater understanding of the merits, because the strength or weakness of the case directly bears on the value of the bargain.  Without any information from Flagship as to its views on Plaintiff's claims, that understanding is lacking.  The near silence of Flagship differentiates this case from others where the reviewing court had a well-rounded view of the litigious issues and controlling precedents, and therefore could genuinely analyze the eighth and ninth Girsh factors.  See, e.g., National Football League, 821 F.3d at 440 (finding that although the plaintiffs would have likely been entitled to "substantial damages awards" if they proved liability, there was significant litigation risk because of the defendant's "pending motion to dismiss and other available affirmative defenses [that] could have left [the plaintiffs] to pursue claims in arbitration or with no recovery at all"); Comcast Corp., 2019 WL 4645331, at *15 (concluding that "in light of the current legal landscape on arbitration, [the settlement] amount represents a good value for a weak case").  Thus, the eighth and ninth Girsh factors weigh heavily against approval.

### C.    **Prudential** Considerations

The Third Circuit has explained that, in addition to the Girsh factors, a proposed settlement should be evaluated under the following considerations (the "Prudential considerations"):

> (1) the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; (2) the existence and probable outcome of claims by other classes and subclasses; (3) the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; (4) whether class or subclass members are accorded the right to opt out of the settlement; (5) whether any provisions for attorneys' fees are reasonable; (6) and whether the procedure for processing individual claims under the settlement is fair and reasonable.

Prudential, 148 F.3d at 323.  However, "[u]nlike the Girsh factors, each of which the district court must consider before approving a class settlement, the Prudential considerations are just that, prudential.  They are permissive and nonexhaustive."  In re Baby Prods. Antitrust Litig., 708 F.3d 163, 174 (3d Cir. 2013).

Some of the Prudential considerations suggest that the settlement should be approved.  The third consideration may favor settlement because class members will each receive $35.30 from approval of the agreement.  While this is far less than what they would be statutorily entitled to if liability were proved, the costs and fees associated with prosecuting an individual action (including the cost of the filing fee and attorney's fees) would reduce any eventual recovery.  The fourth consideration weighs in favor of the settlement because the class members had the right to opt out.

However, the first and fifth Prudential considerations are most relevant here and they strongly suggest approval of the settlement agreement is unwarranted.  The first consideration weighs against the settlement because, for the reasons discussed, there has not been substantial discovery in this case to indicate the substantive issues have matured to the point where counsel can adequately assess the merits of the case.

The fifth <u>Prudential</u> consideration weighs against approval because the requested attorney's fee award is out of proportion to attorney's fee awards in other TCPA cases.[30]  Here, Class Counsel seeks an attorney's fee award of one-third of the settlement fund, or $1,333,333.33. (Plaintiff's Final Approval Memorandum at 4.)  However, in TCPA cases approving an attorney's fee award of one-third of the settlement fund, an extenuating circumstance justified the high award. <u>See, e.g.</u>, <u>Bridgeview Health Care Ctr., Ltd. v. Jerryclark</u>, No. 09 C 5601, 2015 WL 4498741, at *2 n.6 (N.D. Ill. July 23, 2015) (emphasizing that decision to approve one-third attorney's fee award was "tailored to the relatively small size of the common fund"); <u>Hageman v. AT&T Mobility LLC</u>, No. 13-50, 2015 WL 9855925, at *4 (D. Mont. Feb. 11, 2015) (awarding one-third attorney's fee award because class counsel obtained "the largest recovery per class member in the 25 year history of the [TCPA]").

Indeed, in most TCPA settlements, and certainly in TCPA cases that settled before there was any motion practice or merits discovery, a lower attorney's fee award is more appropriate. <u>See, e.g.</u>, <u>Brown</u>, 242 F. Supp. 3d at 370 (attorney's fees of 21.7%); <u>Hashw</u>, 182 F. Supp. 3d at 951 (attorney's fee of 20%); <u>Capital One</u>, 80 F. Supp. 3d at 809 (attorney's fee award of 20.77%); <u>Garcia v. Target Corp.</u>, No. 16-2574, 2020 WL 416402, at *2 (D. Minn. Jan. 27, 2020) (attorney's fee award of 27.5%); <u>Ocwen II</u>, 2019 WL 2103379, at *7 (attorney's fee award of 22%); <u>Vasco</u>, 2016 WL 5930876, at *11 (attorney's fee award of 25%); <u>Ott</u>, 2016 WL 54678, at *6 (attorney's fee award of 25%); <u>Wilkins</u>, 2015 WL 890566, at *10 (attorney's fee award of 23.75%); <u>Grannan</u>, 2012 WL 216522, at *10 (attorney's fee award of 25%); <u>see also</u> <u>Hashw</u>, 182 F. Supp. 3d at 950 (explaining that there "are a number of reasons for [why many TCPA cases award attorney's fees

---

[30] The $10,000 incentive fee requested here is greatly disproportionate to incentive awards that have been approved in other TCPA cases.  The incentive fee issue will be addressed if the parties submit an amended settlement agreement that the Court approves.

in an amount less than one-third of the settlement fund], including that TCPA cases are 'prone to settle,' since counsel experienced with TCPA litigation 'know how to pick a winner'") (internal quotation marks and citations omitted).

In a case such as this, where there was "no real litigation," the Court is doubtful that an attorney's fee award of one-third of the settlement fund is justified.  Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc., 897 F.3d 825, 833 (7th Cir. 2018) (internal quotation marks omitted); see, e.g., id. (finding that a reduced fee award was warranted because immediately after filing of the complaint, the defendant expressed interest in settlement, and "[t]here was no paper discovery; no depositions were taken; and no substantive motions were filed").  Skepticism about the high attorney's fee award is amplified here because every dollar that goes to counsel is one less dollar available for distribution to the class.  See Brown, 242 F. Supp. at 371 (noting that reducing attorney's fees "will increase the net settlement fund by more than $300,000, enhancing the benefit to the class"); see also Rule 23 Advisory Committee Note ("[T]he relief actually delivered to the class can be a significant factor in determining the appropriate fee award.").  This Prudential factor strongly suggests that the settlement should be denied.

### D.   **Baby Products** Considerations

In Baby Products, the Third Circuit articulated an "additional inquir[y]" that bears on the evaluation of a proposed settlement: "the degree of direct benefit provided to the class."  708 F.3d at 174.  In conducting this inquiry,

> a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards.

Id.

The first <u>Baby Products</u> consideration is not relevant because each class member who submitted a valid claim is eligible to receive an individual award.  <u>See</u> <u>Vasco</u>, 2016 WL 5930876, at *8 (finding the first <u>Baby Products</u> consideration not relevant because "[t]he number of individual awards is the same as the number of claims because a [c]lass [m]ember who submitted a claim receives an individual award").  In relation to this consideration, the Court notes that Jump$tart Coalition for Personal Financial Literacy, the cy pres recipient designated by the parties, may not be an appropriate recipient.  If a settlement has a cy pres component, the "proposed cy pres awards [sh]ould be used for a purpose directly and substantially related to the class's interests." <u>Google</u>, 934 F.3d at 330.  Plaintiff has not provided any explanation for why the mission of Jump$tart relates to or furthers the interests of the class members who were harmed by Flagship's allegedly illegal robocalls, which provides another reason for skepticism of the proposed settlement.[31]   <u>See, e.g.</u>, <u>Munday v. Navy Fed. Credit Union</u>, No. 15-1629, 2016 WL 7655796, at *5 (C.D. Cal. May 26, 2016) (rejecting motion for preliminary approval of TCPA settlement and noting that "the parties fail[ed] to explain how the proposed cy pres recipient [bore] a sufficient relation to the settlement class"); <u>Pine v. A Place for Mom, Inc.</u>, No. 17-1826 TSZ,

---

[31] There is uncertainty as to the legitimacy of cy pres distributions in class action settlements.  Last term, the Supreme Court considered a case that involved an $8 million settlement, of which $5 million went to cy pres and more than $2 million went to class counsel (no money went to absent class members).  <u>Frank v. Gaos</u>, 139 S. Ct. 1041, 1043 (2019).  The Supreme Court ultimately did not address the propriety of this "cy pres only" settlement because it remanded for reconsideration of standing in light of <u>Spokeo, Inc. v. Robbins</u>.  <u>Id.</u> at 1046.  In dissent, Justice Thomas opined that cy pres only arrangements do not meet various of the Rule 23 requirements, including Rule 23(a)(4)'s requirement that representation be adequate, Rule 23(e)(2)'s requirement that the settlement be fair and reasonable, and Rule 23(b)(3)'s requirement that a class action be superior.  <u>Id.</u> at 1047.  Separately, Chief Justice Roberts has highlighted "fundamental concerns" about cy pres only settlements, noting that in a suitable case, the Supreme Court "may need to clarify the limits on the use of such remedies."  <u>Marek v. Lane</u>, 571 U.S. 1003 (2013) (Roberts, C.J., statement respecting denial of certiorari).  The Third Circuit has held that "cy pres-only settlements [for a Rule 23(b)(2) injunction class] are [not] unfair per se under Rule 23(e)(2)."  <u>Google</u>, 934 F.3d at 326.  Separate from the question of whether a cy pres only settlement is proper, the Third Circuit has acknowledged that "a district court does not abuse its discretion by approving a class action settlement agreement that includes a cy pres component directing the distribution of excess settlement funds to a third party to be used for a purpose related to the class injury."  <u>Baby Products</u>, 708 F.3d at 172.  However, <u>Baby Products</u> cautioned that "direct distributions to the class are preferred over cy pres distributions [where the] private causes of action … were created by Congress to allow plaintiffs to recover compensatory damages for their injuries."  <u>Id.</u> at 173.

ECF 135 (Minute Order), at ¶ 1(d) (W.D. Wash. Sept. 25, 2019) (rejecting cy pres recipient because "[a]lthough the identified charity might be of some interest to the individuals for whom defendant provides or has provided services, the parties have not explained how it addresses or even relates to the concerns underlying the [TCPA], under which this case was brought").

The second <u>Baby Products</u> consideration does not clearly favor or disfavor the settlement. Each class member will receive $35.30 if the settlement agreement is approved.  On one hand, although this amount is a fraction of the $500 statutory damage allocation under the TCPA, it is possible that the costs of prosecuting an individual action may have absorbed the statutory damage award, making the $35.30 settlement an attractive option.  On the other hand, $35.30 is relatively low compared to other TCPA settlements, and is likely de minimis in the Court's view.

As to the third <u>Baby Products</u> consideration, individual awards are simply a function of the number of class members who file valid claims.  As discussed in subsection IV.C, the Court queries whether TCPA settlements can be structured more effectively to ensure that class members are not penalized for high participation and that injury is more closely tethered to recovery.  However, these reservations are endemic to the nature of settlements under the TCPA—neither Flagship nor Class Counsel is at fault.  This consideration is not relevant.  <u>Cf.</u> <u>id.</u> (finding that "[g]iven the administrative and practical difficulties [c]laim [m]embers may face in proving multiple violations, [the claim process awarding each member the same award regardless of the number of violations] is fair").

**VI.    Conclusion**

For the foregoing reasons, the Court denies the current Motion for Final Approval of Class Action Settlement and Motion for An Award of Attorneys' Fees and Expenses and an Incentive Award to the Named Plaintiff.  The Court is primarily concerned with three aspects of the proposed

settlement: first, the lack of information available to counsel to inform their view and advise the class of the strengths and weaknesses of the case given the early posture in which the parties reached agreement; second, the emphasis on Flagship's inability to pay more than $4 million when no underlying financial information was provided to the class members, compounded by the Court's belief, after in camera review of the financials, that this statement is inaccurate; and third, the Court's skepticism that $4 million is a fair settlement in this case, given that it will result in a de minimis per claimant recovery of $35.30.

The combination of these concerns, plus the amount of attorney's fees requested by Class Counsel, leads the Court to deny final approval of the settlement.  However, the Court does not foreclose the possibility of approving an amended settlement agreement that is revised to address the concerns outlined in this Memorandum.[32]

An appropriate order follows.

O:\CIVIL 17\17-2069 Ward v Flagship Credit\17cv2069 Memorandum re Motion for Final Approval.docx

---

[32] The Court encourages counsel to consider, in the context of this case, a "high-low" settlement.  Counsel should also discuss a schedule for Flagship to answer the Complaint and complete discovery, and should suggest dates for the service of expert reports, see, e.g., Thompson-Harbach, 359 F. Supp. 3d at 612 (summarizing deposition of plaintiff's expert on a TCPA question); Charvat, 2019 WL 5576932, at *1 (noting that "expert discovery" was conducted in TCPA case), whether in the context of preparation for trial or the proposal of a new settlement agreement.

**APPENDIX**

| TCPA Comparison Chart Prepared by Court, Supplemented by Class Counsel | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Settlement Fund | Size of Class | Participation Rate | Per Claimant Award | Attorney's Fees (% of Settlement Fund) | Incentive Award Per Named Pl. | Per Claimant Award Adjusted to Ward Participation Rate[33] |
| Baseline: Ward | $4M | 329,198 | 20.5% | $35.30 | 33% | $10,000 | $35.30 |
| Brown[34] | $3M | 138,000 | 7.3% | $144 | 23% | $5,000 | $51.53 |
| Vasco[35] | $5.2M | 1,100,000 | 9% | $26.63 | 25% | $3,000 | $11.75 |
| Duchene[36] | $10M | 966,164 | 13.48% | $49.78 | 33% | $10,000 | $32.89 |
| Grannan[37] | $1M | 137,891 | 1.44% | $300-$325 | 25% | $5,000 | $21.18–$22.94 |
| Rose[38] | $32M | 7,000,000 | 3.2% | $20-$40 | N/A (not computed as %) | $2,000 | $3.14–$6.27 |
| Kolinek[39] | $11M | 9,200,000 | 2.5% | $30 | 36% | $5,000 | $3.68 |
| Bayat[40] | $3.4M | 871,836 | 1.9% | $151 | N/A (not computed as %) | $2,000 | $14.06 |
| Couser[41] | $8.5M | 3,982,645 | 7.7% | $13.75 | 15% | $1,500 | $5.19 |
| Wright[42] | $12.1M | 2,343,988 | 6.3% | $45 | 30% | $5,000 | $13.90 |
| Hashw[43] | $12.5M | 1,200,000 | 20% | $33.20 | 20% | $15,000 | $32.55 |
| Ott[44] | $7.5M | 3,552,434 | 0.8% | $140.86 | 25% | $5,000 | $5.52 |

[33] This figure was calculated by Class Counsel by dividing the Per Claimant Award by the proportional difference between the participation rates in this case and the participation rates in the comparison cases: Per Claimant Award / (Ward Participation Rate / Case Participation Rate).

[34] Brown v. Rita's Water Ice Franchise Co. LLC, Civil Action No. 15-3509, 2017 WL 4102586 (E.D. Pa. Sept. 14, 2017).

[35] Vasco v. Power Home Remodeling Grp. LLC., Civil Action No. 15-4623, 2016 WL 5930876 (E.D. Pa. Oct. 12, 2016).

[36] Duchene v. Westlake Servs., LLC, Civil Action No. 2:13-cv-1577, 2016 WL 6916734 (W.D. Pa. July 14, 2016) (referencing Docket 13-cv-1577, ECF No. 123).

[37] Grannan v. Alliant Law Grp., P.C., No. C10-02803 HRL, 2012 WL 216522 (N.D. Cal. Jan. 24, 2012).

[38] Rose v. Bank of Am. Corp., Case No. 5:11-CV-02390, 2014 WL 4273358 (N.D. Cal. Aug. 29, 2014).

[39] Kolinek v. Walgreen Co., 311 F.R.D. 483 (N.D. Ill. 2015).

[40] Bayat v. Bank of the W., No. C-13-2376 EMC, 2015 WL 1744342 (N.D. Cal. Apr. 15, 2015).

[41] Couser v. Comenity Bank, 125 F. Supp. 3d 1034 (S.D. Cal. 2015).

[42] Wright v. Nationstar Mortg. LLC, No. 14 C 10457, 2016 WL 4505169 (N.D. Ill Aug. 29, 2016).

[43] Hashw v. Dep't Stores Nat'l Bank, 182 F. Supp. 3d 935 (D. Minn. 2016).

[44] Ott v. Mortg. Inv'rs Corp. of Ohio, Inc., Case No. 3:14-cv-00645, 2016 WL 54678 (D. Or. Jan. 5, 2016).

| Gehrich[45] | $34M | 32,297,356 | 1.08% | $52.50 | Sliding scale: 30% of first $10 M of settlement; 25% of second $10 M; etc. | $1,500 | | $2.78 |
|---|---|---|---|---|---|---|---|---|

[45] <u>Gehrich v. Chase Bank USA, N.A.</u>, 316 F.R.D. 215 (N.D. Ill. 2016).